## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DARNELL SCOTT,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **GENESIS HEALTHCARE, INC., et al.,** | : | **NO. 15-0916** |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM

**Tucker, C.J.**                                                **August 22, 2016**

Presently before the Court are Defendants' Motion for Summary Judgment (Doc. 25), Plaintiff's Response in Opposition (Doc. 27), and Defendants' Reply to Plaintiff's Response in Opposition (Doc. 31). Upon consideration of the parties' submissions and exhibits and for the reasons set forth below, this Court GRANTS IN PART and DENIES IN PART Defendants' Motion.

## I.      FACTUAL BACKGROUND

In his Complaint, Plaintiff Darnell Scott ("Plaintiff") alleges that Defendants Genesis Healthcare, Inc. ("Genesis Healthcare") and 650 Edison Avenue Operations, LLC d/b/a Somerton Center ("Somerton Center") (collectively, "Defendants") violated 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").[1] The material undisputed facts follow.

---

[1] In his Complaint, Plaintiff indicated that he "plan[ned] to amend the . . . complaint to include claims pursuant to the Pennsylvania Human Relations Act ('PHRA') if and when such claims are administratively exhausted with the Pennsylvania Human Relations Commission ('PHRC'). Such claims will mirror Plaintiff's federal claims." Compl. at 1 n.1, Doc. 1. Plaintiff never amended the Complaint to

Defendant Somerton Center "is a short and long-term care facility located in Philadelphia, Pennsylvania." Defs. Joint Stmt. of Undisputed Material Facts ¶ 1, Doc. 25. Plaintiff, an African American individual, began working at Somerton Center as a Maintenance Assistant in January 2014.[2] Arthur Lyons ("Lyons"), an African American individual, was the Administrator at Somerton Center and one of Plaintiff's supervisors. Joseph Schweitzer ("Schweitzer"), a Caucasian individual, became Plaintiff's direct supervisor shortly after Plaintiff began working at Somerton Center.

Somerton Center has an Employee Handbook that contains an Equal Employment Opportunity Policy which applied to Plaintiff's employment at Somerton Center. *Id.* ¶¶ 4–6. The Employee Handbook has a policy of prohibiting discrimination based on race and details the manner in which an employee may report discrimination and harassment. *Id.* ¶ 7–8. Furthermore, the Employee Handbook includes an Introductory Period Policy. According to the Introductory Period Policy, "new employees will participate in a 90-day introductory period and employees who transfer or are promoted into new positions may be required to successfully complete a new 90-day introductory period to demonstrate their potential for success in the new position." *Id.* ¶ 9. Additionally, as a new employee, Plaintiff was required to successfully complete a probationary period of employment. Nonetheless, "[s]uccessful completion of the introductory period was not a guarantee of future employment for [Plaintiff] or any other introductory employee[]." *Id.* ¶ 11.

On or about January 28, 2014, Plaintiff "received a verbal warning from . . . Schweitzer for three late arrivals within one pay period." *Id.* ¶ 15. Somerton Center's time records indicated

---

include claims pursuant to the PHRA. Accordingly, the Court will not address any state law cause of action.

[2] At all relevant times, Plaintiff was an at-will employee at Somerton Center. Defs. Joint Stmt. of Undisputed Material Facts ¶ 10, Doc. 25.

that Plaintiff was late on the dates specified on the warning.[3]  On or about February 20, 2014, Plaintiff received a thirty-day progress report.  Of the twelve categories included in the report, Plaintiff received a rating of "Needs Improvement" in eight categories, "including overall ability to handle the job, performs all essential job functions, performs high quality of work, and completes tasks timely." *Id.* ¶ 16. Plaintiff received a rating of "Meets Expectations" in the remaining four categories, including "demonstrates teamwork, demonstrates good customer service, observes policies and procedures, and practices good grooming and neatness."  *Id.* Plaintiff "did not receive any ratings of "'Above Expectations.'"  *Id.*  The attached addendum to the progress report suggested that Plaintiff "(1) show up on time for his scheduled shift; (2) be more proactive about his workflow, and become more time oriented and forward thinking with basic daily tasks; (3) keep focus on the task at hand; and (4) avoid socialization."  *Id.* ¶ 17.

On or about April 8, 2014 and April 9, 2014, Plaintiff received a ninety-day progress report.[4]  Of the twelve categories included in the report, Plaintiff received a rating of "Needs Improvement" in nine categories.  *Id.* ¶ 18.  Plaintiff received a rating of "Meets Expectations" in two categories—"practices good grooming and neatness, and adheres to attendance policies."  *Id.* Plaintiff did not receive a rating in the "Performance Expectations" category.  *Id.*  Additionally, Plaintiff "did not receive any ratings of 'Above Expectations.'"  *Id.*   After receiving his ninety-day progress report, Defendants did not terminate Plaintiff.  Instead, Defendants extended Plaintiff's introductory period by an additional thirty days.

---

[3] Defendants' statement is inherently contradictory. Defendants maintain that Plaintiff received a verbal warning from Schweitzer and then state that Somerton Center's records reflect that Plaintiff "was late on the dates *listed on the warning*."  Defs. Joint Stmt. of Undisputed Material Facts ¶ 15 (emphasis added). Therefore, it is unclear as to whether the warning was verbal, written, or both.
[4] The date on the ninety-day progress report is April 8, 2014.  Pl. Resp., Exh. N, Doc 27.

On May 1, 2014, Schweitzer instructed Plaintiff to repair the motor on a bariatric bed. The bariatric bed was "a very large, two-ton bed."  Defs. Reply at 10, Doc. 31. [5]  The bariatric bed was located in a room with two residents. The resident whose bed that Plaintiff repaired was not present during the repair.  The other resident whose bed did not need repairing was present in the room while Plaintiff worked on the bed.  At some point during the day, Plaintiff asked Schweitzer to take a lunch break and Schweitzer approved. While on his break, Plaintiff left the bed that he was repairing on its side (the "Bed Incident").  Lyons "testified that [Plaintiff] left the room in a dangerous situation without somebody there monitoring it and created a pretty significant safety violation."  Defs. Joint Stmt. of Undisputed Material Facts ¶ 25.  Schweitzer also "testified that [Plaintiff's] actions created a safety issue." *Id.* ¶ 26.

After the Bed Incident, Schweitzer recommended that Lyons terminate Plaintiff.  Lyons subsequently approved the recommendation.  Schweitzer and Lyons "terminated [Plaintiff's] employment because he failed to complete his introductory period as a result of his poor performance (including lack of job knowledge, continued inability to train, unscheduled breaks, constant insubordinate behavior, and excessive fraternization)."  Defs. Reply at 10.  In addition to poor performance, Schweitzer and Lyons terminated Plaintiff for "his creation of [an] unsafe working condition while on a last chance extension of his introductory period."  *Id.*  On May 13, 2014, Plaintiff's termination became effective.  Schweitzer later replaced Plaintiff with Damon Lattimore-El, an African American individual.  Defs. Joint Stmt. of Undisputed Material Facts ¶ 27.  Lyons also approved the replacement.  *Id.*

---

[5] After Plaintiff filed his Response in Opposition and included Plaintiff's Statement of Material and Disputed Facts (Doc. 27), Defendants supplemented their statement of undisputed material facts in their Reply brief (Doc. 31). The Court will incorporate the undisputed material facts alleged in the Reply brief to the extent they allege new undisputed facts that were not included in the original Joint Statement of Undisputed Material Facts (Doc. 25).

In addition to the above-mentioned undisputed facts, Plaintiff provides a litany of facts that he considers material and disputed.[6]

A. *Managerial Hierarchy and Job Positions at Defendants Genesis Healthcare and Somerton Center*

Plaintiff claims that "Defendant Somerton Center . . . is one of Defendant Genesis Healthcare's facilities, located at 650 Edison Avenue, Philadelphia, PA." Pl. Stmt. of Material and Disputed Facts ¶ 1, Doc. 27.  Prior to working at Somerton Center, Plaintiff obtained a high school degree as well as certificates in Carpentry and Green Manufacturing. *Id.* ¶ 3. Additionally, Plaintiff had experience as a Maintenance Assistant at another facility of Defendant Genesis Healthcare, Brinton Manor. *Id.* At Brinton Manor, Plaintiff "perform[ed] largely the same job responsibilities[,]" as he did at Somerton Center, "from in or about January 2013 through in or about January of 2014." *Id.* Plaintiff avers that "[a]t all relevant times herein, [Plaintiff's] employment at Defendant Somerton [Center] was governed by Defendant Genesis Healthcare's employee handbook and all terms and conditions outlined therein." *Id.* ¶ 1 n.3 (emphasis omitted).

As a Maintenance Assistant at Somerton Center, Plaintiff "was responsible for performing standard and unskilled tasks in the maintenance and repair of the center grounds and facilities; his job required him to interact with personnel, residents, families and visitors." *Id.* ¶ 5.  Lyons, the Administrator at Somerton Center, "was responsible for the overall operations of the facility . . . [and] had six (6) direct reports." *Id.* ¶ 6.  The Maintenance Director, Recreation Director, Food Service Director, Director of Nursing, Business Office Manager, and Clinical Reimbursement Coordinator reported to Lyons. *Id.* Schweitzer, the Maintenance Supervisor,

---

[6] Plaintiff alleges that "Defendants' submission of their 'non-disputed facts' in support of their Motion for Summary Judgment omits entirely the materially disputed facts in this case." Pl. Stmt. of Material and Disputed Facts at 1 n.1, Doc. 27.

"was responsible for supervising the entire Maintenance Department." *Id.* ¶ 8. Schweitzer had, "[w]ith respect to disciplinary action in his department, . . . authority to terminate employees; he just needed 'approval' from the Administrator and HR." *Id.* ¶¶ 9–10 (citing Schweitzer Dep. at 16:22–24; 17:1–2, 7–8). While Plaintiff was an employee at Somerton Center, Suzanne Lewis ("Lewis"), an African American individual, was a Human Resources Manager for Defendant Genesis Healthcare. *Id.* ¶ 7.

   B.  *Schweitzer's Discriminatory Conduct*

   According to Plaintiff, Schweitzer "directly informed [Plaintiff that] '[m]ost of these black people in this building only have employment because of Welfare to Work . . . . [Plaintiff] was lucky to have [his] job, because if it was up to [Schweitzer], he would have fired sic [him].'" *Id.* ¶ 11 (emphasis omitted) (quoting Scott Dep. at 156:1–5). Schweitzer demeaned Plaintiff on multiple occasions by "informing [Plaintiff] that he didn't know how [Plaintiff] got into the position [in the first instance]." *Id.* ¶ 12. Schweitzer would also "'yell that [Plaintiff] was lucky to have [his] job. . . . [because] [i]f it were up to Schweitzer, [he'd] be gone. . . . [since] [Plaintiff] didn't know what he was doing.'" *Id.* ¶ 13 (quoting Scott Dep. at 62:7–12). Additionally, Schweitzer would "'yell at [Plaintiff] to clock out and leave [his] shift before the shifts would be over.'" *Id.* (quoting Scott Dep. at 62:7–12). Schweitzer also told Plaintiff that "he could make his job difficult, as he had targeted another Maintenance Assistant, Dave Hamilton . . . (African American), by 'pushing papers on him.'" *Id.* ¶ 14 (footnote omitted) (quoting Scott Dep. at 92:9–15). Schweitzer allegedly told Plaintiff that he would "push as many papers if [he] would have to, you know, force you either out of this position, out of the job.'" *Id.* (quoting Scott Dep. at 92:9–15).

Additionally, according to Plaintiff, "Schweitzer literally yelled at [Plaintiff] in common hallways and in front of other employee(s), and when [Plaintiff] would complete tasks in his log book and hand them to . . . Schweitzer, he would throw the work papers into the air." *Id.* ¶ 15. When Schweitzer yelled at Plaintiff, he would do so "very close to [Plaintiff's] face, as if he [were] going to get physical." *Id.*  Additionally, when Schweitzer yelled at Plaintiff, he would "include[] threats about completion of work assignments." *Id.*  In addition to yelling, "Schweitzer's threatening behavior included kicking open doors, throwing paperwork, and telling [Plaintiff] to get the 'f***' out of his office." *Id.* (quoting Scott Dep. at 28:1–8; 158:2–5). Furthermore, "Schweitzer's overtly aggressive and hostile behavior was not exhibited equally towards other employees, . . . Schweitzer directed these mannerisms to 'people of color.'" *Id.* ¶ 16 (citing Scott Dep. at 28:4–11, 14–15; 315:5–18, 21–24; 316:1–3).[7]  Plaintiff "'never observed . . . Schweitzer direct any of this sort of conduct to any non-black employees." *Id.*  Additionally, Plaintiff alleges that Schweitzer would "refer[] to the African American employees as 'you people.'" *Id.* (quoting Exh. H at Resp. No. 13).

Plaintiff avers that his "work tasks were assigned based on a 'log sheet' which was used to track rounds and assign work areas." *Id.* ¶ 17.  Plaintiff claims that Schweitzer managed the log sheet and "once [Plaintiff] completed all his daily tasks, Schweitzer would add on and inform [Plaintiff] that if he did not complete them – don't come in tomorrow." *Id.*  Plaintiff cried as a result of Schweitzer's alleged conduct. *Id.*  (citing Scott Dep. at 156:22–24; 157:1–3).

Plaintiff claims that once he "accumulated vacation time and would put in formal requests in a timely manner . . . [that] Schweitzer would deny it." *Id.* ¶ 18.  According to Plaintiff, Schweitzer told Plaintiff that "'he didn't deserve it' (despite that employees are entitled

---

[7] According to Plaintiff, "Schweitzer treated . . . Dave Hamilton, Anthony (last name unknown), Michelle (last name unknown), and Pam (last name unknown)" in a similar manner.  Pl. Stmt. of Material and Disputed Facts ¶ 16.

to Paid Time Off (PTO) days within Defendant Genesis[] [Healthcare's] policies and procedures)." *Id.* (quoting Scott Dep. at 29:3–6) (citing Exh. V).  In order for Plaintiff to use his accrued vacation time he would contact Human Resources or Lyons and these requests were granted. *Id.*

Plaintiff also maintains that he "would . . . take authorized lunch breaks, and before the conclusion of [the lunch break] (which employees were required to take the entire time or they would be disciplined) . . . Schweitzer would tell him to go back to work." *Id.* ¶ 19 (footnote omitted) (citing Scott Dep. 31:12–18).

As a result of some of the above-mentioned conduct by Schweitzer, Plaintiff told Lewis that "he believed Schweitzer was 'trying to overwhelm [him] or break [his] spirit.'" *Id.* ¶ 20 (quoting Scott Dep. 176:10–20; 177:13–22).  Lewis then told Plaintiff to "just complete whatever he [could] complete and try not to worry about it." *Id.*

### C.  *Maintenance Assistants at Somerton Center*

At all relevant times, Defendant Somerton Center had two Maintenance Assistants who reported directly to Schweitzer. *Id.* ¶ 21.  While Plaintiff worked at Somerton Center, he held one of the Maintenance Assistant positions and Girard McGroatry ("McGroatry"), a Caucasian individual, held the other position. *Id.* Both McGroatry and Plaintiff reported directly to Schweitzer. *Id.*

According to Plaintiff, Schweitzer utilized "a method called 'informal in-servicing' (i.e. verbal counseling)" with McGroatry. *Id.* ¶ 22. Under the informal in-servicing method "if a later infraction occurred with McGroatry (which [Schweitzer] admits did happen), [Schweitzer] would have followed policy and issued McGroatry a written warning (pursuant to Defendant Genesis[] [Healthcare's] progressive discipline policies)." *Id.* (citing Schweitzer Dep. at 20:20–

24; 21:1–10). Plaintiff maintains that Schweitzer did not utilize this method with Plaintiff concerning the Bed Incident.  *Id.*

Schweitzer had to verbally counsel McGroatry once concerning McGroatry's "bringing in an outside vendor without department approval . . . when he retained a vendor to fix the bell system." *Id.* ¶ 23 (emphasis omitted).  Subsequent to this verbal counseling, however, McGroatry retained a vendor to repair a compactor without department approval.  *Id.* McGroatry's actions "resulted in hefty costs, in the thousands of dollars range, expended by Defendant Genesis [Healthcare]." *Id.* (emphasis omitted) (citing Schweitzer Dep. 19:14–21:10). As a result of the second infraction, Schweitzer allegedly "administered a write up to McGroatry." *Id.* ¶ 24.  Plaintiff alleges, however, that "discovery showed that zero write ups were ever issued." *Id.* (emphasis omitted).

Additionally, Plaintiff maintains that he did not observe Schweitzer yell at or make any derogatory comments to McGroatry.  *Id.* ¶ 24.

### D.  *Plaintiff's Thirty Day Evaluation*

Plaintiff maintains that "[o]n or about January 29, 2014, Schweitzer was directed to start drafting the 30 Day Progress Report for [Plaintiff]." *Id.* ¶ 27.  Around the same time, Plaintiff "met with management and HR to troubleshoot his issues, and resolve the problems he had with Schweitzer." *Id.* ¶ 28.  During the meeting with management and HR, "Schweitzer was formally counseled for his lack of professionalism toward [Plaintiff]." *Id.* ¶ 29 (citing Exh. L at point 5). Nonetheless, "[t]he only thing Schweitzer conceded about his discipline for 'unprofessionalism' is that he had referred to [Plaintiff] as a 'knucklehead' in front of his peers, and received a verbal warning during this meeting for his lack of professionalism.'" *Id.* n.8 (quoting Schweitzer Dep. at 85:10–24; 86:1–22).

According to Plaintiff, "Lyons and Lewis . . . made Schweitzer change two (2) rating[s] to 'meets expectations' (i.e. demonstrates team work, and observes policies and procedures) where Schweitzer originally had a negative rating" on Plaintiff's thirty-day progress report. *Id.* ¶ 32. Plaintiff disagreed with various ratings in the progress report, specifically "the suggestion that he wasn't completing tasks . . . he completed all tasks asked of him, and none were left undone." *Id.* ¶ 33. Plaintiff claims that "[w]hen [he] informed management that he was, in fact, completing all assignments, Lyons suggested that [Plaintiff] turn his worksheets into him directly – instead of Schweitzer." *Id.* (citing Scott Dep. at 230:24; 231:1–12). Plaintiff also disagreed with "Schweitzer's directive regarding 'Fraternization'" because Plaintiff was "'unaware of who [he] socialize[d] with and how much [he was] socializing.'" *Id.* ¶ 34 (quoting Exh. M at D84).

### E.  *Plaintiff's Ninety Day Evaluation*

Plaintiff maintains that "[a]t the time of the 90 Day Progress Report, Schweitzer met with Lyons and Lewis and requested termination based on 'performance.'" *Id.* ¶ 38 (citing Exh. O; Schweitzer Dep. at 121:3–9). Instead of terminating Plaintiff, Human Resources and Lyons "push[ed] for an extension of the probationary period by another 30 days." *Id.* (citing Schweitzer Dep. at 126:9–24; 127:1–2). After Schweitzer's attempted termination of Plaintiff, Human Resources Manager, William Merrill "advised Lewis that Schweitzer 'needs to understand that the review over the next 30 days needs to focus solely on behavior and performance – not feelings and emotions.'" *Id.* ¶ 39 (quoting Exh. O).

Plaintiff disagreed with the ninety-day progress report. In particular, Plaintiff "wrote in the comments section: 'All of my tasks that are assigned are completed and I work at a high quality rate. And also, all of the residents in my area are speaking highly of me, so I totally disagree with this progress report.'" *Id.* ¶ 40 (quoting Scott Dep. at 242:23–24; 243:1–4) (citing

Exh. N).  After the ninety-day progress report, Plaintiff "did not receive any indication that management did not deem his performance acceptable." *Id.* ¶ 42.  Additionally, Plaintiff maintains that "Lyons encouraged [Plaintiff] and shared feedback that [Plaintiff] was doing a better job." *Id.*

### F.  Plaintiff's First Statement to Human Resources

In early May 2014, Plaintiff, Lewis, and numerous other Genesis Healthcare employees "attended a work-related 'rally' in Harrisburg, PA." *Id.* ¶ 43 (quoting Lewis Dep. at 101:11–22). While "[a]t the rally, [Plaintiff] again raised Schweitzer's mistreatment towards him with . . . Lewis, including the temper, comments made, threats regarding his employment, and specifically asked . . . Lewis if she perceived . . . Schweitzer to be a racist." *Id.* ¶ 44.  Plaintiff also "confided in her that Schweitzer was saying that half the black staff wouldn't be employed unless they had Welfare to Work." *Id.*  In response, Lewis told Plaintiff that he "should try to prevent things as much as possible, 'avoid being in the line of fire' and just do [Plaintiff's] job the best way possible, and he wouldn't have anything to worry about." *Id.* ¶ 45.  Lewis also "emphasized that . . . Schweitzer was his superior and he should be careful with any steps [Plaintiff] took around him." *Id.* (quoting Scott Dep. at 184:18–24; 186:19–23).

### G.  Plaintiff's Second Statement to Human Resources

On the same day that Defendants terminated Plaintiff, Plaintiff "again approached Lewis, asking for the number to Corporate Integrity. *Id.* ¶ 46.  Lewis "assured [Plaintiff] [that] he would have the number before the day ended." *Id.*  Defendants terminated Plaintiff prior to Plaintiff's receipt of the Corporate Integrity phone number.

### H.  Plaintiff's Termination

On May 13, 2014, Defendants terminated Plaintiff for the Bed Incident which occurred on May 1, 2014.  Plaintiff alleges, and "Lyon concedes[,] that at the time [Plaintiff] was presented with the termination papers for this incident, [Plaintiff] specifically informed . . . Lyons that he had asked Schweitzer to go on his break – and that Schweitzer knew the bed was on its side."  *Id.* ¶ 49 (emphasis omitted).  Further, "Schweitzer was aware that the job was not yet complete."  *Id.* ¶ 58.[8]  According to Lyons, though Schweitzer proposed Plaintiff's termination, "this was a 'pretty significant safety violation,' and therefore, they (including Lewis) moved to terminate."  *Id.* ¶ 50 (quoting Lyons Dep. at 66:13–24; 67:1–24; 68:1–12).  Schweitzer, Lewis, and Lyons were present for Plaintiff's termination meeting, though Schweitzer was the one who informed Plaintiff that Defendants were terminating Plaintiff because of Plaintiff's violation of safety procedures.  *Id.* ¶ 52.

### I.  Plaintiff's Replacement

Plaintiff maintains that his replacement, Damon Lattimore-El, "was not offered a job with Defendants until late August 2014/early September 2014, which position started effective September 2, 2014."  *Id.* ¶ 68.  According to Plaintiff, Schweitzer is not the sole decisionmaker concerning the hiring of new maintenance employees  *Id.* ¶ 69.  Instead, "Lyons is ultimately responsible for all hiring decisions."  *Id.*

## II.  PROCEDURAL HISTORY

On July 11, 2014, Plaintiff filed charges of race discrimination, hostile work environment, and retaliation with the United States Equal Employment Opportunity Commission.  Pl. Resp., Exh., Doc. 27.  On February 23, 2015, Plaintiff filed his Complaint in

---

[8] Plaintiff alleges that upon returning from break, "Schweitzer threatened him with a write-up for having taken the break . . . [and] proceeded to tell [Plaintiff] that he was 'worthless' and Schweitzer didn't need him."  Pl. Stmt. of Material and Disputed Facts ¶ 59.

this Court (the "Complaint").  Doc. 1.  On December 2, 2015, Defendant filed the instant Motion for Summary Judgment.  Doc. 25.

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, courts shall grant summary judgment in favor of the moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it is "one that might 'affect the outcome of the suit under governing law.'"  *Smith v. Johnson & Johnson*, 593 F.3d 280, 284 (3d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   A dispute as to a material fact is "genuine" if it "is one that 'may reasonably be resolved in favor of either party.'"  *Lomando v. United States*, 667 F.3d 363, 371 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 250).

The movant has the initial "burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact."  *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015).  If the movant can sustain its initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a *genuine issue for trial.*'"  *Id.*  (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Thus, while "the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact."  *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir.2006).  When assessing the motion for summary judgment, the court "must construe all evidence in the light most favorable to the nonmoving party."  *Santini*, 795 F.3d at 416. Moreover, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## IV.   DISCUSSION

Plaintiff alleges that Defendants violated Title VII and § 1981 by unlawfully (1) discriminating against him on the basis of his race, (2) creating a hostile work environment, and (3) retaliating against Plaintiff for opposing the discriminatory conduct.  A plaintiff may bring a claim pursuant to § 1981 "'when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.'"  *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 220 (3d Cir. 2015) (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)).  Similarly, a plaintiff may bring a claim under Title VII when an employer contravenes an "important purpose of Title VII—that the workplace be an environment free of discrimination, where race is not a barrier to opportunity."  *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009).  Accordingly, in assessing Plaintiff's race discrimination, hostile work environment, and retaliation claims, "the substantive elements of a § 1981 claim mirror those of a Title VII claim in many respects."  *Faush*, 808 F.3d at 220.[9]  Specifically, "both the direct evidence test introduced by *Price Waterhouse v.*

---

[9]       In *Estate of Oliva ex rel. McHugh v. N.J.*, the Third Circuit found that "[i]n a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981 violation."  604 F.3d 788, 798 (3d Cir. 2010).  Nonetheless, in a 2015 nonprecedential opinion the Third Circuit determined that summary judgment in favor of the defendant employer was appropriate on the plaintiff's § 1981 claim, yet the court still evaluated Plaintiff's retaliation claim and determined that summary judgment in favor of the employer was appropriate as well.  *Walker v. Centocor Ortho Biotech, Inc.*, 558 F. App'x 216, 218–21 (3d Cir. 2014). Similarly, the Third Circuit evaluated a plaintiff's retaliation claims under § 1981 despite the court determining that the district court appropriately denied summary judgment on the

*Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and the burden-shifting

framework introduced by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36

L.Ed.2d 668 (1973), may be used to determine whether an employer has discriminated against a

plaintiff in violation of § 1981." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267–68 (3d

Cir. 2010). The Court will address each of Defendants' arguments in turn.

   A. *Race Discrimination*

   Title VII prohibits an employer from terminating "any individual . . . because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff

may demonstrate that his employer engaged in "[d]isparate treatment discrimination . . . by either

using direct evidence of intent to discriminate or using indirect evidence from which a court

could infer intent to discriminate." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir.

2008). The court will consider evidence as "direct" when the evidence is "'so revealing of

[discriminatory] animus that it is unnecessary to rely on the [*McDonnell Douglas*] burden-

shifting framework, under which the burden of proof remains with the plaintiff.'" *Anderson*, 621

---

underlying § 1981 claim. *Fenter v. Mondelez Glob., LLC*, 574 F. App'x 213, 216–18 (3d Cir. 2014); *see also Ke v. Drexel Univ.*, -- F. App'x --, No. 15–3377, 2016 WL 1105404, at *2–3 (3d Cir. Mar. 22, 2016); *Miller v. Thomas Jefferson Univ. Hosp.*, 565 F. App'x 88, 91–93 (3d Cir. 2014); *Stites v. Alan Ritchey, Inc.*, 458 F. App'x110, 112 (3d Cir. 2012).

   Moreover, in the comments to Third Circuit Model Civil Jury Instructions § 6.1.6 entitled "Elements of a Section 1981 Claim – Retaliation" the Committee noted that in *Oliva*, the Third Circuit added an element to Section 1981 retaliation claims that does not apply to Title VII retaliation claims. Third Circuit Model Civil Jury Instructions § 6.1.6 cmt. at 23. More specifically, the requirement that "'a plaintiff must demonstrate that there had been an underlying section 1981 violation.'" *Id.* (quoting *Estate of Oliva ex rel. McHugh*, 604 F.3d at 798). The Committee found, however, that "[a]s of spring 2016, no other circuit[] had adopted such a requirement for Section 1981 claims." *Id.* at 24. Additionally, "such a requirement appears to conflict with the understanding of at least some Justices." *Id.* Further, "*Oliva's* statement that a Section 1981 retaliation claim requires proof of an underlying Section 1981 violation may also be in some degree of tension with a prior opinion by the Court of Appeals." *Id.*; *see also Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 414–15 (3d Cir.1999).

   This Court finds that Plaintiff is not required to demonstrate that there had been an underlying section 1981 violation. Accordingly, the Court will address the merits of Plaintiff's retaliation claim below.

15

F.3d at 269 (quoting *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512 (3d Cir. 1997)).

Direct evidence "must be strong enough 'to permit the factfinder to infer that a discriminatory

attitude was more likely than not a motivating factor in the [defendant's] decision' . . . [and] the

evidence must be connected to the decision being challenged by the plaintiff." *Id.* (quoting

*Walden*, 126 F.3d at 513 (internal quotation marks omitted)).  Although "courts agree on what

is *not* direct evidence—*e.g.*, statements by non-decisionmakers, statements by decisionmakers

unrelated to the contested employment decision, and other 'stray remarks'—there is no

consensus on what is." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 n.2 (3d Cir. 2002).

     In the present case, Plaintiff testified that Schweitzer made discriminatory statements;

however these statements were not made in relation to Plaintiff's termination from Somerton

Center.  Plaintiff testified that "Schweitzer said most of these people – most of these black

people in this building only have employment because of Welfare to Work.[10] Scott Dep. at

156:1–4, Doc. 28.  Plaintiff also testified that Schweitzer told Plaintiff that he was "lucky to have

[his] job, because if it [were] up to [Schweitzer], [Plaintiff] would have been fired." *Id.* at

156:4–5.  These statements are also not "strong enough 'to permit the factfinder to infer that a

discriminatory attitude was more likely than not a motivating factor in the [defendant's]

decision[.]'" *Anderson*, 621 F.3d at 269 (quoting *Walden*, 126 F.3d at 513 (internal quotation

marks omitted)).  Accordingly, Plaintiff "supports [his] claim with evidence from which

discrimination may be inferred. . . . therefore [the Court will] use the familiar *McDonnell*

*Douglas* burden-shifting framework" to assess Plaintiff's Title VII and § 1981 race

discrimination claims.  *Doe*, 527 F.3d at 364.

---

[10] On at least two other occasions, Plaintiff testified that Schweitzer said that "[h]alf of the employe[e]s
wouldn't have a job if it wasn't for Welfare-toWork Program."  Scott Dep. at 161:11–13; *see also id.* at
187:8–10.  Accordingly, it is uncertain whether Schweitzer allegedly said "most" or "half" of the
employees would not have a job if it were not for the Welfare-to-Work program.

Under *McDonnell Douglas*,

> the plaintiff must first establish a prima facie case of discrimination by showing that: (1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. . . . If a plaintiff establishes a prima facie case of discrimination, then an inference of discriminatory motive arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. . . . . If the defendant does so, the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for intentional discrimination.

*Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). Though the burden of production shifts between the parties, "the . . . plaintiff at all times bears the ultimate burden of persuasion." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (internal quotation marks omitted). Accordingly, the Court will determine whether Plaintiff satisfied this burden to preclude the Court from granting summary judgment in favor of Defendants.

### 1. Prima Facie Case

First, Plaintiff must demonstrate that he satisfies the prima facie case. *Makky*, 541 F.3d at 214. As explained above, Plaintiff must prove that (1) he is a member of a protected class, (2) he was qualified for the Maintenance Assistant position, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination. *Id.* Accordingly, "[t]he 'central focus' of the *prima facie* case 'is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (quoting *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999)). Therefore, "[t]here is a low bar for establishing a *prima facie* case of employment discrimination." *Scheidemantle v. Slipper Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006). At the prima facie stage, "the goal . . . is to 'eliminate . . . the most common

nondiscriminatory reasons' for the defendant's actions; by doing so, the prima facie case creates an inference that the defendant's actions were discriminatory." *Anderson*, 621 F.3d at 271 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

Defendants allege that Plaintiff "cannot establish a *prima facie* case of discrimination, because he was not qualified for his position and no reasonable factfinder could reject Somerton Center's reason for [Plaintiff's] termination." Defs. Mot. for Summary Judgment at 4, Doc. 25. Plaintiff, however, maintains that he satisfies the prima facie case because he can demonstrate that he was qualified for the Maintenance Assistant position and his termination occurred under circumstances that could give rise to an inference of intentional discrimination.

It is clear that Plaintiff satisfies the first prong of the prima facie case because he identifies as African American. Additionally, because Defendants terminated Plaintiff, Plaintiff suffered an adverse employment action and satisfied the third prong of the prima facie case. The issues are whether Plaintiff can satisfy the second and fourth prongs. Accordingly, the Court will determine whether Plaintiff was qualified for the position and whether his termination occurred under circumstances that would give rise to an inference of intentional discrimination.

In regards to the second prong, courts must "determine a plaintiff's qualifications for purposes of proving a prima facie case by an objective standard." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995). Plaintiff testified that he graduated high school and attended a certified program in carpentry at Catawba County Community College and Caldwell Community College. Scott Dep. at 70:1–14. Plaintiff also obtained a Green Manufacturing certification from the Community College of Philadelphia. *Id.* at 15–21. Additionally, Plaintiff had prior experience as a Maintenance Assistant when he worked at Brinton Manor—a facility operated by Defendant Genesis Healthcare. After reviewing the job description for the

Maintenance Helper position, Plaintiff testified that the description detailed "the position [he] held at Brinton Manor and at Somerton Center." *Id.* at 105:13–106:2. Plaintiff further explained that his responsibilities at both facilities were similar; however the actual facilities were different. *Id.* at 113:16–23. Accordingly, though Defendants presented a history of work performance issues with Plaintiff, the evidence supports a finding that Plaintiff was at least objectively qualified for the Maintenance Assistant position at Somerton Center.

Next, Defendants contend that Plaintiff cannot demonstrate that his termination occurred under circumstances that would give rise to an inference of intentional discrimination. Defendants maintain that Plaintiff "was replaced by an African-American individual, Damon Lattimore-El, after he was terminated from Somerton Center. . . . [and] [c]ourts uniformly hold that when a plaintiff is replaced by someone within the same protected class (or a plaintiff is unable to show otherwise), his *prima facie* case fails." Reply Br. at 16. Defendants' argument, however, falls short.

Rather, "a plaintiff claiming discriminatory firing need not prove, to make out a prima facie case, that [he] was replaced by someone outside the relevant class." *Pivirotto*, 191 F.3d at 347. For example, in *Pivirotto*, the Third Circuit found that "even if a woman is fired and replaced by another woman, she may have been treated differently from similarly situated male employees." *Id.* at 353–54. The court reasoned that "[t]he fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force, and it would be prudent for a plaintiff in this situation to counter (or explain) such evidence." *Id.* at 354. Nevertheless, "this fact does not, as a matter of law or logic, foreclose the plaintiff from proving that the employer was motivated by her gender (or other protected characteristic) when it discharged her." *Id.* Similarly, in the instant case, the fact that Plaintiff was replaced by an

African American employee does not foreclose Plaintiff's race discrimination claim because Plaintiff points to evidence that Defendants' decision to terminate Plaintiff was motivated by his race.

Defendants also argue that "Somerton Center's Administrator, Arthur Lyons, was the final decision-maker with regard to [Plaintiff's] termination. . . . [and] [t]hroughout his testimony, [Plaintiff] acknowledged . . . Lyons's fairness and good judgment." Reply Br. at 17. Defendants aver that "[a]gainst this factual backdrop, the record is also undisputed that . . . Lyons agreed with many of . . . Schweitzer's observations about [Plaintiff's] performance, including [Plaintiff's] excessive socializing while at work, and ultimately approved the decision to terminate [Plaintiff's] employment." *Id.* Therefore, "[t]hese undisputed facts leave no room for an inference of discriminatory animus on the part of . . . Lyons; thus, [Plaintiff's] race discrimination claim fails under the weight of his own admissions." *Id.* The Court disagrees.

In *Staub v. Proctor Hospital*, the Supreme Court "consider[ed] the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." 562 U.S. 411, 413 (2011). Staub sued his former employer, Proctor Hospital, "under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq.,* claiming that his discharge was motivated by hostility to his obligations as a military reservist." *Staub*, 562 U.S. at 415. The Supreme Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 422 (footnote omitted).

Though the Supreme Court decided *Staub* in the context of the USERRA, the Supreme Court found that the USERRA "is very similar to Title VII."  *Id.* at 417.

In the present case, Lyons, as Administrator at Somerton Center, was the final decisionmaker regarding Plaintiff's termination.  Schweitzer, however, recommended Plaintiff's termination.  Schweitzer Dep. at 140:13–23.  Additionally, Schweitzer completed the initial drafts of Plaintiff's thirty-day and ninety-day progress reports.  While Schweitzer was not the final decisionmaker, Schweitzer influenced Plaintiff's progress reports and recommended Plaintiff's termination; thereby "influenc[ing] . . . the ultimate employment decision."  *Staub*, 562 U.S. at 413.  Thus, though Lyons demonstrated no racial animus towards Plaintiff, Plaintiff's allegations that Schweitzer completed inaccurate progress reports and wrongly recommended Plaintiff's termination can demonstrate that Schweitzer intended for Lyons to terminate Plaintiff and Schweitzer's actions were the proximate cause of Plaintiff's termination.

In contrast, Plaintiff alleges that Schweitzer's alleged discriminatory statements could give rise to an inference of intentional discrimination.  Pl. Resp. at 17–18.  Plaintiff testified that Schweitzer said "most of these people – most of these black people in this building only have employment because of Welfare to Work.[11]  Scott Dep. at 156:1–4.  Plaintiff also testified that Schweitzer told Plaintiff that he was "lucky to have [his] job, because if it [were] up to [Schweitzer], [Plaintiff] would have been fired." *Id.* at 156:4–5.  According to Plaintiff, Schweitzer "would mention . . . [that] he would make [Plaintiff's] job difficult, and that [Schweitzer] had targeted a previous employe[e] by the name of Dave[12] by pushing papers." *Id.*

---

[11] *See supra* note 10.
[12] Dave is an African American individual who previously worked in the Maintenance Department along with Plaintiff, Schweitzer, and a former supervisor—Mark.  Scott Dep. at 138:5 –19.  Dave eventually transferred to another facility.  *Id.* at 140: 23–24.

at 92:9–13.  Schweitzer stated that he would "push as many papers if [he] would have to, you know, force you either out of this position, out of the job."  *Id.* at 92:13–15.

Defendants argue that "[o]nly *one* comment refers, in any way, to race, and does not even evidence racial animus."  Reply Br. at 18.  Defendants maintain that "[t]he statements do not support an inference of discrimination sufficient to prove a *prima facie* case."  *Id.*  There is, however, a genuine dispute concerning whether Schweitzer made these comments to Plaintiff.  As explained above, Plaintiff alleges that Schweitzer made a comment concerning African Americans, threatened Plaintiff's job security, and harassed Plaintiff.  In complete contrast, Schweitzer vehemently denies making any of these statements, however, at this stage of the proceeding, the Court is required to "construe all evidence in the light most favorable to the nonmoving party."  *Santini*, 795 F.3d at 416.

At the prima facie stage, a plaintiff is required to "establish some causal nexus between his membership in a protected class and the decision to [terminate] him."  *Sarullo*, 352 F.3d 789, 798 (3d Cir. 2003).  This burden of establishing a prima facie case of disparate treatment is not onerous.''  *Anderson*, 621 F.3d at 270–71 (3d Cir. 2010) (quoting *Burdine*, 450 U.S. at 253).  Plaintiff sufficiently demonstrated that Schweitzer's alleged statements concerning African Americans and alleged discriminatory treatment of Plaintiff could give rise to an inference of intentional discrimination.  Accordingly, Plaintiff satisfies all four elements of the prima facie case and the burden of production shifts to Defendants.  *Makky*, 541 F.3d at 214.

### 2. Legitimate Non-Discriminatory Reason for Termination

In order to satisfy their burden, Defendants must articulate a legitimate non-discriminatory reason for Plaintiff's termination.  *Id.*  At this stage of the litigation, Defendant's "burden is 'relatively light.'"  *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (quoting

*Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (internal quotation marks omitted)). Defendants "need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

In the instance case, Defendants allege that they terminated Plaintiff because Plaintiff "failed to successfully complete his introductory period, despite multiple opportunities to improve, culminating in incident in which [Plaintiff] admittedly went on a lunch break and left a very large bariatric bed on its side in a resident's room without any supervision, creating a safety hazard for the residents." Reply Br. at 20. Defendants' Employee Handbook provides that as an employee nears the completion of the introductory period, if the employee's "performance has been marginal; [the employee's] supervisor may extend [the employee's] introductory period as part of a performance improvement plan, or alternatively may decide not to continue [the employee's] employment." Defs. Reply, Exh. B at D0158, Doc. 31. Since failure to successfully complete the introductory period may be a legitimate ground for termination, Defendants satisfied their burden.

### 3. Pretext

Lastly, "the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for intentional discrimination." *Makky*, 541 F.3d at 214. In order for Plaintiff "to defeat summary judgment . . . [he] must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Defendants'] articulated legitimate reason[]; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Defendants'] action." *Fuentes*, 32 F.3d at

764.  At the pretext stage, "the factual inquiry into the alleged discriminatory motives of the

employer . . . rise[s] to a new level of specificity."   *Simpson v. Kay Jewelers, Div. of Sterling,*

*Inc.*, 142 F.3d 639, 646 (3d. Cir.1998).

      The focus of this Court's inquiry will not be "whether the employer made the best, or

even a sound, business decision; [but] whether the real reason is [discrimination].'"   *Keller v.*

*Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting *Carson v. Bethlehem Steel*

*Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)).  This Court must determine whether Plaintiff

"demonstrate[d]such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder *could* rationally find them 'unworthy of credence.'"   *Fuentes*, 32 F.3d at 765

(emphasis in original) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531

(3d Cir. 1992)).  In other words, "the plaintiff's evidence rebutting the employer's proffered

legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's

proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not

actually motivate the employment action (that is, the proffered reason is a pretext)."   *Id.* at 764

(emphasis in original).  Accordingly, "the court's task is to determine whether upon viewing all

of the facts and the reasonable inferences to be drawn therefrom in the light most favorable to the

plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether

the employer intentionally discriminated against the plaintiff."   *Pollock v. Am. Tel. & Tel. Long*

*Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  Thus, this Court must determine whether Plaintiff

sustained his burden of showing that Defendants' legitimate, nondiscriminatory reason for

terminating Plaintiff was pretextual.

The first manner in which Plaintiff may demonstrate that Defendants' reason for terminating Plaintiff was pretextual is by pointing to evidence that would permit the factfinder to reasonably disbelieve Defendants' reason for terminating Plaintiff.  *Fuentes*, 32 F.3d at 764.  In order "[t]o discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  *Id.* at 765.  Instead, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reason[] for its action that a reasonable factfinder *could* rationally find [it] 'unworthy of credence.'"  *Id.* (quoting *Ezold,* 983 F.2d at 531).  Accordingly, "[i]f a plaintiff comes forward with evidence that would cause a reasonable factfinder to find the defendant's proffered reason 'unworthy of credence,' [he] need not adduce any evidence of discrimination beyond [his] prima facie case to survive summary judgment."  *Burton*, 707 F.3d at 430 (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 310 (3d Cir. 2012)).  It is not for this Court, however, to "'sit as a super-personnel department that reexamines an entity's business decisions.'"  *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).  Instead, this Court must determine "'whether the employer gave an honest explanation of its behavior'" that is not discriminatory.  *Id.* (quoting *McCoy*, 957 F.2d at 373).

In the instant matter, Plaintiff claims that Plaintiff did not "engage[] in some form of misconduct which led to his separation" from Somerton Center.  Pl. Resp. at 20, Doc. 27.  Plaintiff testified that on May 1, 2014, Schweitzer helped Plaintiff get the bariatric bed on its side so that Plaintiff may replace the bed's motor.  Scott Dep. at 258:23–260:20.  Plaintiff testified

that "the motor was in place before [his] break. [Plaintiff] was asking for assistance on completing with laying the bed upright and [he] was told to just go on his break." *Id.* at 263:7–21. Specifically, "before the break [Plaintiff] tried to contact [Schweitzer] and [McGroatry] to help [him] turn the bed upright. . . . [but Plaintiff] couldn't get ahold of them." *Id.* at 264:7–12. Plaintiff claims that he was unaware of the fact that Schweitzer "was concerned that the bed had been left on its side . . . [until] after the fact of [Schweitzer] granting [Plaintiff his] break." *Id.* at 264:18–24. After Plaintiff returned from his lunch break, Plaintiff testified that Schweitzer "told [him] that he was going to reprimand or . . . discipline [him] for going on [his] break when [Schweitzer] permitted [Plaintiff's] break." *Id.* at 269:3–5. Plaintiff believed that Schweitzer "targeted" him and "had it out to terminate [him] . . . [f]or [Schweitzer's] own personal reasons." *Id.* at 280:20–24.

Defendant argues, however, that "[e]ven if Somerton Center made a bad decision to terminate [Plaintiff], it may do so as long as the decision is not because of a protected trait, which, here, it was not." Defs. Reply at 22. Moreover, Plaintiff "cannot prove pretext by arguing that Somerton Center's decision was unfair or wrong." This Court agrees. Plaintiff did not point to any evidence that would show that a fact finder could reasonably disbelieve Defendants' proffered reason for terminating Plaintiff. Instead, Plaintiff attempts to demonstrate that he was not at fault for the bed incident. A plaintiff cannot demonstrate pretext by "simply show[ing] that the employer's decision was wrong or mistaken." *Fuentes*, 32 F.3d at 765.

Lyons and Lewis had a conversation after the Bed Incident to determine "whether [Plaintiff] would be given another IPIP progressively or whether [they] felt that this was egregious enough to be . . . the final chance during [Plaintiff's] probationary period." Lyons Dep. at 66:13–67:12. Lyons and Lewis selected the latter. *Id.* at 67:13–15. In Lyons's view,

26

"[l]eaving a bed on its side, . . . particularly a bed of that size in a patient care area . . . [when] at least at some point there was another resident in the room" warranted termination.  *Id.* at 67:22–68:3.  Lyons reasoned that "[e]ven if someone told [Plaintiff] to [leave the bed,] even if [Schweitzer] told him, okay, go to break, leave the bed on its side, you don't leave – you don't leave a room in a dangerous situation without somebody there monitoring it . . . it's a pretty significant safety violation."  *Id.* at 68:5–12.  As explained above, it is not for this Court to "'sit as a super-personnel department that reexamines an entity's business decisions.'"  *Brewer*, 72 F.3d at 332 (quoting *McCoy*, 957 F.2d at 373).  Accordingly, Plaintiff fails to point to evidence that the fact finder could reasonably disbelieve that Defendants terminated Plaintiff for his failure to successfully complete the probationary period, including Plaintiff's decision to leave the bariatric bed unattended and on its side.

The second manner in which Plaintiff may demonstrate that Defendant's reason for terminating Plaintiff was pretextual is by pointing to evidence that would permit the factfinder to "reasonably . . . believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes*, 32 F.3d at 764.  In order for a plaintiff "[t]o show that race was more likely than not a motivating or determinative cause of the employer's action, 'the plaintiff may show that the employer has previously discriminated against [him]."  *Glenn v. Raymour & Flanigan*, 832 F. Supp. 2d 539, 552 (E.D. Pa. 2011) (quoting *Simpson*, 142 F.3d at 645).  The plaintiff may also show "'that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.'"  *Id.* (quoting *Simpson*, 142 F.3d at 645).  Accordingly, "the plaintiff can withstand a motion for summary judgment if [he] produces direct evidence of discriminatory

intent or indirect evidence from which a factfinder can rationally infer that the employer's

justifications were pretextual and that racial discrimination more likely than not motivated the

employer's actions." *Pollock*, 794 F.2d at 864–65 (3d Cir. 1986).

Plaintiff argues that Schweitzer's treatment of a similarly situated employee, McGroatry

who was not in Plaintiff's protected class, could demonstrate that Schweitzer intentionally

discriminated against Plaintiff because of his race.  In order to be considered "similarly situated,"

an "employee does not need to be identically situated, but the comparator must be similar to

plaintiff in 'all relevant respects.'"  *Abdul-Latif v. Cnty.of Lancaster*, 990 F. Supp. 2d 517, 525

(E.D. Pa. 2014) (quoting *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011)).

The "[f]actors relevant to the analysis are whether the employees dealt with the same supervisor,

were subject to the same standards, shared similar job responsibilities and the nature of the

misconduct."  *Id.* at 526.   In terms of the nature of the misconduct, "the plaintiff must show that

'the other employee's acts were of comparable seriousness.'"  *Glenn*, 832 F. Supp. 2d at 548

(quoting *Anderson v. Haverford Coll.*, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (internal quotation

marks omitted)).  Additionally, the plaintiff can demonstrate that both employees "engaged in

similar conduct without such differentiating or mitigating circumstances as would distinguish the

conduct or their employer's treatment of them.'"  *Id.* at 549 (quoting *McCullers v. Napolitano*,

427 F. App'x 190, 195 (3d Cir. 2011) (internal quotation marks omitted)). While the issue of

"[w]hether comparators are similarly situated is generally a question of fact for the jury. . . .

summary judgment is appropriate where there is no evidence from which a jury could conclude

the parties were similarly situated."  *Abdul-Latif*, 990 F. Supp. 2d at 526.

In *Glenn*, the court found that the plaintiff and another employee did not commit similar

misconduct.  *Glenn*, 832 F. Supp. 2d at 549.  Rather, the plaintiff made more threats than the

other employee and did not report the altercation to management.  *Id.*  Thus, the court concluded

that the defendant's treatment of the other employee failed to "raise an inference of unlawful

discrimination regarding [the plaintiff's] termination because there are differentiating and

mitigating circumstances that significantly distinguish both their conduct and [the defendant's]

treatment of them."  *Id.* at 550.

The present case is similar to *Glenn* because Plaintiff and McGroatry did not commit a

similar infraction.  Defendants terminated Plaintiff for failure to successfully complete his

probationary period, including the Bed Incident.  In contrast, there is no evidence that McGroatry

failed to successfully complete his probationary period.  Additionally, Schweitzer recommended

discipline because McGroatry brought "in an outside vendor without department approval."

Schweitzer Dep. at 19:13–14.  Schweitzer then "informally in serviced [McGroatry] not to do it

again, and then a few months later [McGroatry] called in an outside vendor to fix the compactor,

that is when [they] did the written verbal."  *Id.* at 20:24–21:3.  Therefore, Schweitzer did not

reprimand McGroatry for leaving a bariatric bed on its side and unattended while another

resident was present in the room.  Thus, though Plaintiff and McGroatry were both Maintenance

Assistants and reported directly to Schweitzer, they committed dissimilar infractions and are not

similarly situated.

Plaintiff also contends that Schweitzer's alleged comments to Plaintiff demonstrate that

Schweitzer intentionally discriminated against Plaintiff because of his race.  More specifically,

Plaintiff contends that if the Court accepts Plaintiff's recitation of the facts "as true, and draw[s]

all reasonable inferences in [Plaintiff's] favor, a reasonable fact finder could readily conclude

that . . . Schweitzer did not believe that [Plaintiff] (an African American employee) was

deserving of his position with Defendants, and he would do whatever he felt necessary to have

him fired." Pl Resp. at 18. Conversely, Defendants maintain that "[o]nly *one* comment refers, in any way, to race, and does not even evidence racial animus." Defs. Reply at 18.

Plaintiff testified that Schweitzer said "most of these people – most of these black people in this building only have employment because of Welfare to Work.[13] Scott Dep. at 156:1–4. Plaintiff also testified that Schweitzer told Plaintiff that he was "lucky to have [his] job, because if it [were] up to [Schweitzer], he would have been fired [Plaintiff]." *Id.* at 156:4–5. Additionally, Plaintiff maintains that Schweitzer "would mention . . . [that] he would make [Plaintiff's] job difficult, and that [Schweitzer] had targeted a previous employe[e] by the name of Dave by pushing papers." *Id.* at 92:9–13. Schweitzer stated that he would "push as many papers if [he] would have to, you know, force you either out of this position, out of the job." *Id.* at 92:13–15. In stark contrast, Schweitzer vigorously denies making any of these statements. At this stage of the proceeding, however, the Court is required to "construe all evidence in the light most favorable to the nonmoving party." *Santini*, 795 F.3d at 416. The Court should not "weigh the evidence and determine the truth of the matter but . . . determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Therefore, it is not for this Court to determine whether Plaintiff or Schweitzer's account of the facts is more credible. Instead, the Court must focus on whether the plaintiff "produces direct evidence of discriminatory intent or indirect evidence from which a factfinder can rationally infer that the employer's justifications were pretextual and that racial discrimination more likely than not motivated the employer's actions." *Pollock*, 794 F.2d at 864–65. This Court finds that Plaintiff satisfied this burden.

If the facts are as Plaintiff testified, then a factfinder could "reasonably . . . believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. More specifically, if Schweitzer did make

---

[13] *See supra* note 10.

these statements, Plaintiff can demonstrate that Schweitzer suggested that Defendants terminate Plaintiff, not because of the Bed Incident or Plaintiff's failure to complete his probationary period, but because of racial animus towards African Americans.  Thus, summary judgment on the race discrimination claim is inappropriate.

### B.  Hostile Work Environment

Defendants argue that they are entitled to summary judgment on the hostile work environment claim because "[t]here is no evidence [Plaintiff] experienced intentional harassment *because of* his membership in a protected class."  Defs. Mot. for Summ. J. at 4.  Further, "[t]here is no evidence [Plaintiff] experienced harassment that was sufficiently pervasive and regular to constitute a hostile work environment under Title VII or Section 1981."  *Id.*  In contrast, Plaintiff alleges that "[b]ased on the record evidence, a reasonable fact finder could certainly conclude that Schweitzer's action[s] were *because of* his race, and were sufficiently severe **or** pervasive such that this presents a factual question for the jury as to this element."  Pl. Resp. at 32.

In order to succeed on hostile work environment claim for race discrimination, a plaintiff must demonstrate that: "'(1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability.'"  *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001)).  The "[f]actors that may indicate an actionable hostile work environment include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Alers v. City of Phila.*, 919 F. Supp. 2d 528, 543–44 (E.D. Pa. 2013) (quoting *Harris v. Forklift Sys.*,

*Inc.*, 510 U.S. 17, 23 (1993)).  Certain conduct, such as "'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim."  *Caver*, 420 F.3d at 262 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  Instead, "the 'conduct must be extreme to amount to a change in the terms and conditions of employment.'"  *Id.* (quoting *Faragher*, 524 U.S. at 788).  The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

An employer violates Title VII "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).  In contrast, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."  *Id.* at 21–22. Thus, "'mere utterance of an ... epithet which engenders offensive feelings in a[n] employee' . . . does not sufficiently affect the conditions of employment to implicate Title VII."  *Id.* at 21 (quoting *Meritor Sav. Bank, FSB*, 477 U.S. at 67).

Further, "'[r]acial comments that are sporadic or part of casual conversation do not violate Title VII.'"  *Tourtellotte v. Eli Lilly & Co.*, Civil Action No. 09–0774, 2013 WL 1628603, at *8 (E.D. Pa. Apr. 16, 2013) (quoting *Al-Salem v. Bucks Cnty. Water & Sewer Auth.*, No. 97-6843, 1999 U.S. Dist. LEXIS 3609, at *15–16 (E.D. Pa. Mar. 25, 1999)).  Instead, "'[f]or racist comments, slurs and jokes to constitute a hostile work environment, there must be more

than a few isolated incidents of racial enmity, meaning that instead of sporadic racist slurs, there

must be a steady barrage of opprobrious racial comments.'" *Id.* (quoting *Al-Salem*, 1999 U.S.

Dist. LEXIS 3609, at *15–16). Courts "must consider the totality of the circumstances, rather

than parse out the individual incidents, to determine whether the acts that collectively form the

continuing violation are severe or pervasive." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157,

168 (3d Cir. 2013).

In *Caver*, the appellant Lawrence Davis brought numerous claims against his former

employer, the City of Trenton, including a hostile work environment claim. *Caver*, 420 F.3d at

248–49. Davis argued that

> the specific incidents that, when viewed cumulatively, contributed to his hostile
> work environment include: (1) McKee's comment to Valdora during roll call that
> it was "okay to be in the KKK"; (2) Valdora and McKee's use of racial epithets
> when dealing with prisoners; and (3) the racist graffiti and flyers placed around
> the Department by unidentified individuals. He also claims that certain facially
> neutral conduct, such as being referred for unwanted psychiatric evaluations and
> being berated by Valdora and McKee during meetings, was aimed at harassing
> him because of his race.

*Id.* at 263. The Third Circuit found that "no racist comment, written or spoken, was ever

directed at Davis himself." *Id.* Additionally, "Davis [did] not dispute that he never personally

saw any racist graffiti or flyers in the Department; he heard about the graffiti and flyers second-

hand." *Id.* Thus, the court concluded that "[a]s a threshold matter, Davis cannot meet the first

element of the hostile work environment claim under Title VII or the LAD—causation—

*solely* by pointing to comments that were directed at other individuals." *Id.* The Third Circuit

reasoned that "Davis cannot show that the comments would not have been uttered or written but

for *his* race if Davis was neither on the receiving end nor the subject of any comments." *Id.*

The Third Circuit did find, however, that Davis's claims concerning "Valdora and

McKee's conduct toward him, particularly their recommendations for psychiatric evaluation, was

33

racially motivated." *Id.* at 263–64.  The Court reasoned that while "the racist comments involved in this case cannot alone be the basis of a hostile work environment claim, evidence of those comments may be considered in determining whether facially neutral conduct on the part of Valdora and McKee was actually based on Davis' race." *Id.*at 264.  More specifically, "[a] reasonable jury believing Davis' account of the surrounding circumstances—that Valdora and McKee exhibited racist tendencies, and that there was no real basis to think Davis was paranoid—could have concluded that Valdora and McKee wrote intentionally false memos and recommended him for psychiatric treatment in order to harass him based on race." *Id.*  The court ultimately ruled, however, that the error by the district court in restricting the jury's ability to consider the hostile work environment claim was harmless.  *Id.*at 265.

In the instant case, Plaintiff alleges that Schweitzer subjected Plaintiff to a hostile work environment. As explained above, Plaintiff testified that Schweitzer said "most of these people – most of these black people in this building only have employment because of Welfare to Work.[14] Scott Dep. at 156:1–4.  Plaintiff also testified that Schweitzer told Plaintiff that he was "lucky to have [his] job, because if it [were] up to [Schweitzer], [Plaintiff] would have been fired." *Id.* at 156:4–5.  Schweitzer would also "yell at [Plaintiff] to clock out and leave [his] shift before [Plaintiff's] shifts would be over." *Id.* at 62:10–12.  According to Plaintiff, Schweitzer also

> degraded [Plaintiff] on a regular basis, slamm[ed] doors, threaten[ed] [Plaintiff's] continued employment, yell[ed] in [Plaintiff's] face, [told Plaintiff] that he was worthless, [threw Plaintiff's] work papers into the air, provid[ed] subjective and scathing evaluations (which HR and Lyons asked to be changed), attempted to institute formal discipline (which Lyons refused), and ultimately succeeded in having [Plaintiff] fired for false allegations of a purported safety violation.

Pl. Resp. at 32.

---

[14] *See supra* note 10.

Plaintiff also testified that Schweitzer "would mention . . . [that] he would make [Plaintiff's] job difficult, and that [Schweitzer] had targeted a previous employe[e] by the name of Dave by pushing papers."  Scott Dep. at 92:9–13.  Schweitzer stated that he would "push as many papers if [he] would have to, you know, force you either out of this position, out of the job."  *Id.* at 92:13–15.  In contrast, Defendants contend that "[t]here is simply no legitimate basis on which to conclude that . . . Schweitzer's comment about 'Welfare to Work' created an actionable hostile work environment for [Plaintiff]."  Reply Br. at 13–14.  Additionally, Plaintiff's "statement that, had it been up to [Schweitzer], he would have terminated Mr. Scott's employment portends no racial animus at all."  *Id.* at 14.  This Court disagrees.

The instant case presents facts similar to *Caver*.  In *Caver*, the Third Circuit found that while "the racist comments involved in this case cannot alone be the basis of a hostile work environment claim, evidence of those comments may be considered in determining whether facially neutral conduct on the part of Valdora and McKee was actually based on Davis' race."  *Caver*, 420 F.3d at 264.  In particular, the Third Circuit found that "[a] reasonable jury believing Davis' account of the surrounding circumstances—that Valdora and McKee exhibited racist tendencies, and that there was no real basis to think Davis was paranoid—could have concluded that Valdora and McKee wrote intentionally false memos and recommended him for psychiatric treatment in order to harass him based on race."  *Id.*  In the present case, Plaintiff testified that Schweitzer stated that "most of these people – most of these black people in this building only have employment because of Welfare to Work."  Scott Dep. at 156:1–4.  Plaintiff also maintains that Schweitzer stated that Plaintiff "was lucky to have [his] job . . . [because] [i]f it [were] up to [Schweitzer,] [Plaintiff] would be gone . . . because [Plaintiff] didn't know what [he] was doing." *Id.* at 62:8–10.  Further, Schweitzer stated that he would "push as many papers if [he] would

have to, you know, force you either out of this position, out of the job." *Id.* at 92:13–15. Additionally, Plaintiff alleges that Schweitzer engaged in certain conduct such as threatening Plaintiff's employment, slamming doors, yelling at Plaintiff, etc.  Pl. Resp. at 25.

Though Schweitzer and Defendants reject Plaintiff's characterization of the facts, at this stage of the proceeding, the Court must "construe all evidence in the light most favorable to the nonmoving party." *Santini*, 795 F.3d at 416.  Accordingly, Plaintiff demonstrated that a reasonable jury, believing Plaintiff's recitation of the facts—that Schweitzer made comments concerning African Americans and threats to Plaintiff's job security and there was little basis that Plaintiff was performing poorly—could have found that Schweitzer's facially neutral conduct was actually employed to harass Plaintiff on the basis of his race. At the very least, however, there is a genuine dispute concerning whether Schweitzer did make these statements. Additionally, there is a genuine dispute concerning whether Schweitzer employed these tactics and the frequency in which he employed them.  Therefore, summary judgment on the hostile work environment claim is inappropriate.

### C. Retaliation

Defendants argue that they are entitled to summary judgment on the retaliation claim because Plaintiff "cannot establish a *prima facie case* of retaliation, because he did not engage in protected conduct, and even if he did, there is no causal link between the protected conduct and his termination."  Defs. Mot. for Summ. J. at 5.  Plaintiff contends, however, that summary judgment is inappropriate on the retaliation claim.

Title VII prohibits "an employer [from] discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In order to succeed on a retaliation claim, a plaintiff "must establish a prima facie case by showing '(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir.2007)).[15] If the plaintiff can establish a prima facie case, "the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action." *Id.* If the employer proffers a legitimate, non-retaliatory reason, "the burden shifts back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id.* (quoting *Marra*, 497 F.3d at 300). While "the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times." *Id.*

In the present case, Plaintiff argues that "he made two (2) discreet complaints of race discrimination to the Human Resources Manager, Suzanne Lewis." Pl. Resp. at 29. More specifically, Plaintiff testified that he spoke to Lewis as they were leaving the work-related rally and heading to the bus. Scott Dep. at 183:4–20. Plaintiff told Lewis "about [Schweitzer's] temper, his comments that he made to [Plaintiff,] his threats." *Id.* at 184:7–11. Plaintiff testified that he and Lewis discussed whether Schweitzer was racist. *Id.* at 184:13–15. According to Plaintiff, Lewis told Plaintiff to "prevent it as much as possible. Avoid being in the line of fire and just complete [his] task at hand. . . . Just do [his] job [the] best way possible and [Plaintiff]

---

[15] As explained above, Plaintiff did not present direct evidence of discrimination. Therefore, the Court will rely on "the burden-shifting framework that the Supreme Court announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

[does not] have anything to worry about." *Id.* at 184:20–24.  Additionally, Lewis instructed

Plaintiff that Schweitzer was his "superior" and Plaintiff should "stay clear, be careful of the

steps [he] make[s] around [Schweitzer]." *Id.* at 186: 21–23.[16]  Plaintiff also testified that on May

13, 2014, he asked Lewis "for the number for corporate integrity." *Id.* at 201:11–12.  Prior to

Lewis giving Plaintiff the number, however, Plaintiff received his termination papers. *Id.* at

201:14–17.

Accordingly, the Court will determine whether Plaintiff satisfied the elements of a prima

facie case.

### 1. Protected Activity

First, Plaintiff must demonstrate that he engaged in a protected employee activity.

*Daniels*, 776 F.3d at 193 (quoting *Marra*, 497 F.3d at 300).  In regards to a "'protected activity,'

the anti-retaliation provision of Title VII protects those who participate in certain Title VII

proceedings (the 'participation clause') and those who oppose discrimination made unlawful by

Title VII (the 'opposition clause')." *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006).

Irrespective of "[w]hether the employee opposes, or participates in a proceeding against, the

employer's activity, the employee must hold an objectively reasonable belief, in good faith, that

the activity they oppose is unlawful under Title VII." *Id.*  In other words, "if no reasonable

person could have believed that the underlying incident complained about constituted unlawful

---

[16] In contrast, Lewis testified that she did not recall Plaintiff telling her that Plaintiff "thought he was
being discriminated against by . . . Schweitzer." Lewis Dep. at 100:7–10.  Additionally, Lewis testified
that Plaintiff did not tell her that "he thought that he was being treated differently because of his race."
*Id.* at 100:11–14.  Further, Lewis stated that Plaintiff never told her that Schweitzer allegedly said that
"most of these black people in this building only have employment because of welfare to work" and that
Plaintiff "was lucky to have his job because if it [were] up to [Schweitzer] [Plaintiff] would have been
fired." *Id.* at 100:15–101:7.  Additionally, Lewis said that she did not recall "any conversations that [she]
had with [Plaintiff] about . . . Schweitzer on the way back from that rally." *Id.* at 102:7–12.  Lewis denied
that Plaintiff ever told her that "he believed . . . Schweitzer was racist." *Id.* at 103:23–104:1.
Nonetheless, for purposes of this Motion, the Court must "construe all evidence in the light most
favorable to the nonmoving party" and will assume that the conversation between Lewis and Plaintiff did
take place. *Santini*, 795 F.3d at 416.

discrimination, then the complaint is not protected." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008). Moreover, "[i]n order to constitute protected activity, however, a complaint 'must be specific enough to notify management of the particular type of discrimination at issue.'" *Kier v. F. Lackland & Sons, LLC*, 72 F. Supp. 3d 597, 616 (E.D. Pa. 2014) (quoting *Sanchez v. SunGard Availability Servs., LP*, 362 F. App'x 283, 288 (3d Cir.2010)). Nonetheless, "a victim of retaliation 'need not prove the merits of the underlying discrimination complaint' in order to seek redress." *Moore*, 461 F.3d at 344 (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996)).

In the instant matter, Plaintiff alleges that he opposed race discrimination by making two complaints to Lewis. Accordingly, the Court will determine whether Plaintiff's opposition conduct constitutes a protected activity.

The Third Circuit "recognize[s] that protected opposition conduct includes more than formal filing of charges before the EEOC." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). Accordingly, under "the first prong of a prima facie case of retaliation, protected 'opposition' activity [also] includes . . . 'informal protests of discriminatory employment practices, including making complaints to management.'" *Daniels*, 776 F.3d at 193 (quoting *Curay-Cramer*, 450 F.3d at 135). Additionally, protected opposition conduct includes "'writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support for co-workers who have filed formal charges.'" *Curay-Cramer*, 450 F.3d at 135 (quoting *Sumner v. U. S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). The opposition conduct must, however, "identify the employer and the practice—if not specifically, at least by context." *Id.* Thus, "[a] general complaint of unfair treatment is insufficient to establish protected activity under Title VII." *Id.* Nonetheless, the

court, "[w]hen deciding whether a plaintiff has engaged in opposition conduct, look to the message being conveyed rather than the means of conveyance." *Id.*

As explained above, Plaintiff testified that he opposed Defendants' discrimination in two manners.  First, Plaintiff testified that he spoke to Lewis as they were leaving the work-related rally and heading to the bus in early May 2014.  Scott Dep. at 183:4–20.  Plaintiff told Lewis "about [Schweitzer's] temper, his comments that he made to [Plaintiff,] his threats." *Id.* at 184:7–11.  Plaintiff testified that he and Lewis discussed whether Schweitzer was racist. *Id.* at 184:13–15.  Though Plaintiff did not explicitly tell Lewis that he perceived Schweitzer as discriminating against him because of his race, Plaintiff did insinuate that Schweitzer was treating Plaintiff differently because he may be a racist.  Thus, this was not a general complaint of unfair treatment. Rather, Plaintiff made an informal protest to management concerning Schweitzer's treatment of Plaintiff and Plaintiff's belief that Schweitzer treated Plaintiff in this manner because he was a racist.  Accordingly, Plaintiff sufficiently demonstrated that he engaged in a protected activity by talking to Lewis regarding his concerns about Schweitzer.

Second, on May 13, 2014—the date of Plaintiff's termination—Plaintiff testified that he asked Lewis "for the number for corporate integrity."  Scott Dep. at 201:11–12.  Prior to Lewis giving Plaintiff the number, however, Plaintiff received his termination papers. *Id.* at 201:14–17.  This activity is not protected. There is no evidence that Plaintiff told Lewis that he wanted the number for corporate integrity because he wanted to report Schweitzer's discrimination.[17] Instead, a general request for the number for corporate integrity is not "'specific enough to notify

---

[17] In his Response in Opposition, Plaintiff alleges that "[o]n the day of his termination, [Plaintiff] again approached Lewis, asking for the number to Corporate Integrity, and re-iterated that he felt he was being mistreated because of his race."  Pl. Resp. at 26, Doc. 27.  Plaintiff explicitly testified, however, that he only "asked for the number for corporate integrity."  Scott Dep. at 201:11–12.  Plaintiff makes no mention of informing Lewis that Plaintiff felt he was being mistreated because of his race.  Therefore, the Response in Opposition erroneously mischaracterizes Plaintiff's testimony.

management of the particular type of discrimination at issue.'"  *Kier*, 72 F. Supp. 3d at 616

(quoting *Sanchez*, 362 F. App'x at 288).  Additionally, a request for the number for corporate

integrity does not convey that Plaintiff was opposing any discriminatory conduct.  Accordingly,

Plaintiff failed to demonstrate that his request for the number for corporate integrity constituted a

protected activity.

2.  <u>Adverse Action</u>

Second, Plaintiff must demonstrate that an adverse action by Defendants occurred

"'either after or contemporaneous with'" Plaintiff's conversation with Lewis concerning

Schweitzer's comments and threats.  *Daniels*, 776 F.3d at 193 (quoting *Marra*, 497 F.3d at 300).

In order "[f]or an employer's action to satisfy the second prong of a prima facie case of

retaliation, the plaintiff 'must show that a reasonable employee would have found the challenged

action materially adverse, which in this context means it well might have dissuaded a reasonable

worker from making or supporting a charge of discrimination.'"  *Daniels*, 776 F.3d at 195

(quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  The court must

"examine the challenged conduct 'from the perspective of a reasonable person in the plaintiff's

position, considering all the circumstances.'"  *Id.* (quoting *Burlington N. & Santa Fe Ry. Co.*,

548 U.S. at 71 (internal quotation marks omitted)).

This Court finds that Plaintiff satisfied the second prong of the prima facie case.

Defendants terminated Plaintiff approximately two weeks after his conversation with Lewis

concerning Schweitzer.  If an employee knew that his employer would terminate him two weeks

after a conversation with a Human Resources employee regarding concerns of discrimination, it

"'might have dissuaded a reasonable worker from making . . . a charge of discrimination.'"  *Id.* at

195 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

41

### 3. Causal Connection

Lastly, Plaintiff must demonstrate a causal connection between his conversation with Lewis and Defendants' termination of Plaintiff. *Id.* at 193 (quoting *Marra*, 497 F.3d at 300). A plaintiff can "illustrate a 'causal link' for purposes of establishing retaliation, or show that certain conduct was 'used' as a basis for employment decisions. . . [by] rely[ing] upon a broad array of evidence to do so." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 283–84 (3d Cir. 2000). For example, timing, ongoing antagonism, an employer's proffering of inconsistent reasons for terminating a plaintiff, and "other evidence gleaned from the record as a whole from which causation can be inferred" are all bases for establishing a causal connection between the plaintiff's protected activity and the defendant's adverse action. *Id.* at 280–81. In order "[t]o demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if 'unusually suggestive.'" *Daniels*, 776 F.3d at 196 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)). A plaintiff cannot, however, "establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels*, 776 F.3d at 196.

In the present case, Defendants argue that Schweitzer and Lyons lacked retaliatory animus because they were unaware of Plaintiff's protected activity. Defs. Reply at 26. Additionally, Defendants contend that "where, as here, an adverse employment decision is based on conduct that preceded the protected activity, no causation (and, hence, no retaliation) exists." *Id.* at 27. In contrast, Plaintiff claims that "[s]ummary [j]udgment should be denied as to [Plaintiff's] retaliation claim alone based solely on temporal proximity." Pl. Resp. at 29. Further, Plaintiffs contend that "[w]hile Defendants attempt to distance . . . Lewis from the

decision to terminate . . . both Schweitzer and Lyons testified that . . . Lewis was intimately involved." *Id.* Plaintiff also argues that the record "demonstrates that the bases for his termination could be rejected, and a jury could reasonably conclude that an infraction two (2) weeks prior to his termination . . . could be construed as retaliation." *Id.* at 31.

The Court finds that summary judgment on the retaliation claim is appropriate because Defendants sufficiently demonstrated that there is no causal connection between Plaintiff's conversation with Lewis and Defendants' termination of Plaintiff.   The evidence clearly demonstrates that Schweitzer made the decision to terminate Plaintiff and Lyons subsequently approved the termination.  Furthermore, there is no evidence that Schweitzer or Lyons knew of Plaintiff's protected activity when they decided to terminate Plaintiff.  As explained above, Schweitzer and Lyons "terminated [Plaintiff's] employment because he failed to complete his introductory period as a result of his poor performance (including lack of job knowledge, continued inability to train, unscheduled breaks, constant insubordinate behavior, and excessive fraternization)."  Defs. Reply at 10.  In addition to poor performance, Schweitzer and Lyons terminated Plaintiff for "his creation of [an] unsafe working condition while on a last chance extension of his introductory period."  *Id.*  Plaintiff fails to point to any evidence that Schweitzer or Lyons knew of Plaintiff's conversation with Lewis after the rally when they made the decision to terminate Plaintiff.  Therefore, Plaintiff failed to establish a causal connection between Plaintiff's conversation with Lewis and his termination in regards to the decisionmakers— Schweitzer and Lyons.  *See Daniels*, 776 F.3d at 196.

Even if Schweitzer and Lyons consulted Lewis prior to Plaintiff's termination, Plaintiff did not proffer sufficient evidence demonstrating that Lewis had an "intimate" involvement with Defendant's decision to terminate Plaintiff.  Rather, Lewis testified that she was involved in

Plaintiff's termination by merely "providing information that[] [was] on file. . . . [to the] [h]iring manager and . . . administrator."  Lewis Dep. at 37:19–39:11.  The only occasions that Lewis recommended that Defendant Somerton Center terminate an employee concerned the termination of approximately three to five certified nursing assistants.  *Id.* at 39:12–40:6.  Accordingly, there is no evidence that Lewis influenced or was intimately involved with Schweitzer and Lyons's decision to terminate Plaintiff.  Plaintiff failed to demonstrate a causal connection between his conversation with Lewis and Defendants' termination of Plaintiff.  *Id.* at 193 (quoting *Marra*, 497 F.3d at 300).  Therefore, this Court will grant summary judgment on the retaliation claim.

## V.    CONCLUSION

For the reasons explained herein, this Court will deny summary judgment on the race discrimination and the hostile work environment claims because there are genuine issues of material facts concerning Schweitzer's statements to Plaintiff and Schweitzer's actions toward Plaintiff.  This Court will grant summary judgment on the retaliation claim because Plaintiff failed to demonstrate a causal connection between his protected activity and his termination.  Accordingly, this Court will grant in part and deny in part Defendants' Motion for Summary Judgment.  An appropriate order follows.